# IN THE UNITED STATES DISTRICT COURT
# FOR THE WETERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )    **CRIMINAL NO. 7:19-CR-94** |
| | ) |
| **IOANA-CRISTINA PAVEL,** | ) |
| | ) |
| **Defendant** | ) |

## OPPOSITION TO PRETRIAL RELEASE

    IOANA-CRISTINA PAVEL has filed a motion for release on the basis that the global pandemic of coronavirus COVID-19 is a changed circumstance meriting her release. Although the government readily acknowledges the serious and unique nature of this pandemic, the pandemic does not justify the release of an inmate who is a flight risk. To date, counsel has not been informed that any person in United States Marshal Service ("USMS") custody in the Western District of Virginia has COVID-19 or that the virus has been introduced to a Virginia Department of Corrections ("DOC") or local jail facility at which federal inmates are housed.[1] Moreover, Virginia DOC is prepared to treat inmates and prevent spread if COVID-19 is introduced into one of the facilities.

    The defendant's generic argument that the COVID-19 pandemic warrants her pretrial release runs counter to the individualized determination required by the Bail Reform Act, which requires the Court to consider a number of factors in deciding whether the defendant is a danger to the community or a flight risk. Although Ms. Pavel did not oppose the entry of a detention

---

[1] Although many of our defendants are in regional or local jail facilities, these entities are governed by standards developed by the Virginia State Board of Corrections and implemented by the VA Department of Corrections. Va Code Ann. §§ 53.1-5, 53.1-8, 53.1-10.

order, in detaining her pending the trial of this matter this Court determined that she was a flight risk. ECF No. 14. The COVID-19 outbreak does not alter this individualized risk assessment. Accordingly, like other courts to have considered the same issue, this Court should deny the motion. *See United States v. Martin*, PWG-19-140 (D. Md.), ECF No. 209; *United States v. Bilbrough*, TDC-20-33 (D. Md.), ECF No. 76 (Order by Magistrate Judge Sullivan); *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March 19, 2020.

## Background

On September 25, 2019, the defendant was arrested pursuant to a federal criminal complaint, which charged her with Access Device Fraud and Aggravated Identity Theft. Prior to this arrest, the defendant had been incarcerated since May 5, 2019 on similar state charges arising out of events that occurred in Botetourt County, Virginia. At her initial appearance on October 1, 2019, the defendant did not contest entry of a detention order but reserved the right to request the court establish conditions of release in the future. In detaining the defendant, the Court found that the weight of the government's evidence was strong, the defendant lacked significant community or family ties to this district, and had significant family or other ties outside of the United States. ECF No. 14. By way of a superseding indictment returned in January 2020, the defendant now stands charged with Conspiracy, Bank Fraud, Access Device Fraud and Aggravated Identity Theft. Her trial is scheduled to commence on May 26, 2020.

On March 26, 2020, the defendant filed a motion for release. ECF No. 53. The defendant's only argument in favor of release is speculation regarding COVID-19 and the possibility of the virus spreading among the inmate population. Having reserved the right to request the Court establish conditions of her release, the defendant's motion is appropriate for consideration.

**Argument**

The defendant relies on the speculative prospect of a COVID-19 outbreak at the Roanoke City Jail where she currently is housed. The motion does not assert that either the defendant or any other detainee at the facility has been diagnosed with COVID-19. Further, as described further below, jails, including the Roanoke City Jail, continue to take precautionary measures to prevent transmission of COVID-19 into the facility. Based upon the information set forth in the Court's records to date, along with what is advanced below, the defendant's motion should be denied.

I.   **Legal Standards for Pre-Trial Detention**

A defendant must be detained pending trial where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is thus appropriate where a defendant is either a danger to the community or a flight risk. The government must prove "risk of flight" by a preponderance of the evidence. *See United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985). And must prove "dangerousness" by clear and convincing evidence. *See United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir. 1985); *accord* 18 U.S.C. § 3142(f)(2).

Categorical grants or denials of bail, untethered from an individualized determination, are impermissible. That is because the Bail Reform Act mandates an individualized evaluation guided by the factors articulated in § 3142(g). Those factors are:

(1)   the nature and circumstances of the offense charged;

(2)   the weight of the evidence against the defendant;

(3)   the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and

    4)     the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g).

## II. The § 3142 Factors Weigh Heavily in Favor of Detention: The Defendant Remains A Flight Risk

The defendant's motion, which focuses exclusively on the COVID-19 outbreak, does not address the § 3142(g) factors a court must consider in determining whether a defendant poses a flight risk. While this pandemic has affected numerous communities in Virginia, it has no bearing on whether conditions of release will reasonably assure the defendant's appearance. In this case, an examination of the § 3142(g) factors demonstrates that the detention order should remain in place.

### a. The Nature and Circumstances of the Offense

The affidavit submitted in support of the criminal complaint provides a fair synopsis of how the defendant came to be arrested and the activities of the group with whom she associated. This group is responsible for stealing at least $350,000 in or around this district, although the defendant may ultimately be held responsible for a lesser amount based upon her later arrival. Their conduct impacted banks and customers in Roanoke, Lynchburg, Martinsville/Henry County, Blacksburg/Montgomery County, Patrick County, Botetourt County, Campbell County, Appomattox County and Farmville. A money laundering prosecution of certain members of this group, not including the defendant, is now occurring in Romania. In sum, the defendant participated in a significant and serious criminal endeavor.

### b. Weight of the Evidence

As the Court previously noted, the weight of the Government's evidence is strong. It remains strong and is supported not only by the circumstances leading to the defendant's arrest but

4

also by bank ATM surveillance images that show the defendant committing fraudulent transactions.

      **c.**      **History and Characteristics of the Person**

The defendant does not appear to have any prior criminal history. However, she has zero familial or community ties to this district. Rather she is a Romanian citizen who came, or was brought, to the United States to commit criminal offenses. There is an ICE detainer currently in place although counsel is uncertain as to the practical effect of that detainer in light of present circumstances. Additionally, by her own admission she appears to have a problem with alcohol consumption.

      **d.**      **The Nature and Seriousness of the Danger to the Community in the Event of the Defendant's Release**

The government is not aware of any information indicating that the defendant would be a danger to the community if released. It is also unlikely she would have the means to continue committing similar offenses on her own.

    **III.**    **COVID-19 Does Not Change The § 3142 Factors That Warranted Detention In The First Place.**

Nothing about the COVID-19 pandemic materially changes the defendant's incentive to flee or ability to abscond. *See* 18 U.S.C. § 3142(e)(1). Even with no previous criminal history, she remains subject to serving at least a two-year mandatory minimum sentence upon conviction. Indeed, her belief that incarceration increases her chances of infection—a belief evidenced by her bail motion—suggests that her incentives to avoid punishment have increased. While travel restrictions make certain types of flight more difficult, flight risk is not limited to a defendant physically leaving a jurisdiction; it looks to whether a defendant can be trusted to "appear" "as required."   18 U.S.C. § 3142(e).   Additionally, during a time when community and law-

enforcement resources are devoted to fighting COVID-19, it may be easier for a motivated defendant to abscond. Just as a defendant's access to resources increases his or her risk of flight, so too does law enforcement's lack of access to resources to safeguard against a defendant's flight. *See* 18 U.S.C. § 3142(g)(3)(A) (requiring consideration of the defendant's "financial resources").

### IV. A Potential COVID-19 Outbreak Does Not Eclipse The Other § 3142 Factors.

The defendant's motion focuses on the general potential health risks posed by COVID-19 and essentially claims that risk alone trumps or eclipses the other § 3142 factors. To be sure, the Bail Reform Act instructs courts to consider the "physical and mental condition" of the defendant as one of the factors in its analysis. 18 U.S.C. § 3142(g)(3)(A). But, notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of the defendant's release. Currently, counsel is not aware of any cases of COVID-19 at the Roanoke City Jail. The defendant does not allege that she has COVID-19 or even that she has been exposed to any individuals with COVID-19. In this way, she is not seeking release based on her *actual* "physical and mental condition." Instead she relies solely on the *possibility* of becoming infected. As discussed below, however, the Virginia DOC, which oversees the Roanoke City Jail, has implemented substantial precautionary measures to mitigate this risk and the individual jails also have implemented their own facility-specific measures.

#### a. Comprehensive Precautionary Measures Have Been Instituted To Avoid Transmission Of COVID-19 In The Jails.

DOC and the local jails have undertaken comprehensive precautionary measures to protect detainees from exposure to COVID-19.[2] As additional measures are implemented, DOC is alerting the public to the precautions. *See* https://vadoc.virginia.gov/news-press-releases/2020/covid-19-

---

[2] The Roanoke City Jail's measures can be found here: https://www.roanokeva.gov/835/Sheriffs-Office.

updates/. In addition to the information on the public webpage, the Government has learned the following by communicating with the United States Marshals Service ("USMS").[3]

DOC has installed an "Incident Command System." Each day, the heads of DOC and relevant agencies meet to discuss COVID-19 issues as they pertain to the jails, to discuss strategies to combat any possible spread of COVID through the jails, to track national trends, and to make sure DOC's policies are consistent with those national trends and with recommendations from the Centers for Disease Control and the Virginia Department of Health.

DOC also has taken various steps to protect its inmates. For example, as detailed below, all visitation has been canceled. Moreover, DOC has implemented strict testing and screening for employees and incoming detainees at intake. DOC also has implemented new procedures to maintain cleanliness within the facilities and to increase its medical coverage within facilities. As detailed on DOC's webpage:

**Testing and Screening**

- The Virginia DOC is utilizing its COVID-19 Medical Guideline along with an Offender Screening Questionnaire and Medical Evaluation Tool to evaluate and monitor offenders' health.

- If DOC has an offender in a state correctional facility who appears to meet the criteria for COVID-19 testing, the procedure is to contact the Virginia Department of Health and follow its guidance regarding testing.

- All offenders being released from the VADOC facilities as they finish their sentences are now screened for COVID-19 on the day of their release.

- There is a separate screening tool for employees. All employees must assess their risk on a daily basis prior to reporting to work.

---

[3] The Government is getting continual updates on the situation for USMS. The Government recognizes that the situation is fluid and is trying to deliver the best information to the Court as we understand it at the time.

**Visitation and Telephone Communication**

- All visitation has been canceled.

- While visitation at correctional facilities is canceled for now, off-site video visitation, facilitated through Assisting Families of Inmates (AFOI), remains available. JPay and VADOC have worked together to credit each offender's JPay account with two free JPay stamps per week during this time.

- Virginia DOC has worked with GTL, the offender phone service provider, to provide inmates with two free phone calls per week beginning March 19, 2020 through April 15, 2020. The two free calls will be applied to the first two calls the offender makes each week.

- To assist in preventing the reach of COVID-19 into state correctional facilities, all attorney/authorized attorney representative meetings with offenders will be conducted over the phone until further notice in an attempt to limit the number of persons coming in and out of facilities each day during this pandemic.

**Sanitation and Personal Protective Equipment**

- The Virginia DOC's extensive Medical Epidemic/Pandemic Sanitation Plan is in place to make certain that all Department facilities ensure accurate sanitation during this pandemic while utilizing appropriate chemicals and approved personal protective equipment.

- There is plenty of soap and water at the facilities, and that remains the best way to keep hands clean. Each offender is being given two bars of soap per week for their own personal use.

- Like hospitals and other institutions, the VADOC continues to attempt to order more PPEs (personal protective equipment). However, the nationwide shortage is affecting the VADOC just as it affects everyone else.

- Virginia Correctional Enterprises (VCE), the VADOC's manufacturing division, is now working to manufacture sneeze/cough shield masks for VADOC staff and offenders.

- VCE also manufactures cleaning supplies approved by the EPA for use in combating the coronavirus.

- VCE is working to manufacture sneeze/cough shields for staff and offenders at VADOC facilities. These sneeze/cough shields are being manufactured at four different VCE plants. These are not medical grade masks. They will be distributed to VADOC facilities as soon as possible.

**Facility Staffing**

- There are currently no staffing shortages caused by COVID-19.

- The VADOC continues to plan for every possible contingency. An emergency menu has been developed for use in the event that a corrections facility has food service workers unable to report to work. This menu contains food items that will be centrally ordered.

- The VADOC is working with a temp agency to hire additional nurses for coverage during this pandemic.

**Offender Transportation, Intake and Jail Management**

- As of the Governor's declaration of a state of emergency, the VADOC suspended offender intake from local jails for 30 days. Offender transfers and movement between VADOC facilities is suspended until further notice.

- Offender medical transports continue as scheduled unless an appointment is canceled or changed by the outside provider.

- VADOC facilities have moved to modified lockdown in order to minimize contact between groups of offenders from different buildings. Offenders will eat in their pods and go to recreation with their own pod of offenders and will not eat and recreate with offenders from other pods until further notice.

The defendant's motion does not discuss these DOC precautionary measures or allege that these measures are insufficient to address the needs of detainees. Rather, the defendant's motion highlights various press articles regarding the general risk of the coronavirus to inmate populations generally. But granting a defendant's motion for release based on a general, speculative claim of harm runs contrary to the defendant-specific analysis required by 18 U.S.C. § 3142(f). *United States v. Hill*, APM-19-260 (D.D.C.), Minute Order dated March 19, 2020.

The Virginia DOC has made clear that it is preparing to treat inmates who contract the virus. The Virginia DOC's extensive Medical Epidemic/Pandemic Sanitation Plan is in place to make certain that all Department facilities ensure accurate sanitation during this pandemic while utilizing appropriate chemicals and approved personal protective equipment. And the VADOC is working with a temp agency to hire additional nurses for coverage during this pandemic. Thus

9

the defendant has not shown how any current or future health needs, including potential exposure to the coronavirus, will not be met.

### b. Releasing The Defendant And Others Similarly Situated Would Place An Undue Burden On Pretrial Services And The Court, Thereby Increasing Community Danger.

Awarding relief here, and in similar cases, would place a substantial and unwarranted burden on the Pretrial Services Division of the U.S. Probation Office, our local police officers, and the general public. Whenever the Court orders electronic monitoring, a Location Monitoring Specialist is appointed to oversee the defendant's pretrial release. This would necessarily require face-to-face interaction, on a regular basis, between the defendant and probation staff.[4] To be sure, one case, by itself, would not strain the system. But there are already a number of defendants seeking release based upon concerns regarding COVID-19. And if the Court did release the defendant, and other defendants, such release would quickly stretch the bandwidth of existing probation officers and LM specialists beyond its breaking point.[5]

### V. The Defendant's Home Plan is Not a Viable Option

The defendant has requested to be released to the Way Forward Program at the Roanoke Rescue Mission. However, the Roanoke Rescue Mission has recently advised the United States

---

[4] Telephone check-ins and other typical release protocols will not be sufficient to ensure the defendant's compliance with the terms and conditions of release, particularly in a case, like this one, where the Court already has determined the defendant poses a risk of flight.

[5] Before a defendant is placed on release, a Pretrial Services Officer also must vet the proposed residence and meet the proposed third-party custodian and other residents who live there. A flood of release orders would force these officers to conduct a substantial amount of *in-person*, *in-home* meetings, exposing them to a heightened risk of infection. And if the defendant were released on bond over the government's objection and reoffends, finding space for her in area jails will be difficult because of the additional safeguards jails are instituting—particularly if he exhibits any signs of illness, as quarantine space is limited.

Probation Office that at this time they are not accepting anyone for placement. With respect to the Way Forward Program, a review of the website indicates that the next intake date is not until May 10, 2020. Moreover, should a COVID-19 outbreak occur at the Rescue Mission, it is unlikely that the defendant would be able set forth a suitable alternative given her lack of familial and community ties to the area. Therefore, even if the Court desired to release the defendant on conditions, it does not appear as if her home plan is viable at this time.

### VI. Any Release Should Be Conditioned On A Health Screening

Finally, if the Court does grant defendant's motion, defendant should not be released into the community if she is exhibiting any signs of COVID-19. Instead, the United States Marshals should be granted the discretion to hold defendant if he exhibits symptoms.

As a result, the government respectfully requests that the following language be included in any release order:

> As a condition precedent to release, the defendant shall submit to screening for COVID-19 by the Bureau of Prisons and/or the United States Marshals Service. If the defendant is found to be exhibiting symptoms consistent with COVID-19 or is confirmed to have COVID-19, the defendant shall not be released to the public because of the danger the defendant poses to the community.
>
> Should the defendant not have symptoms consistent with COVID-19 at the time of his release, the defendant shall submit to screening for COVID-19 as directed by the Pretrial Services. Should the defendant then or thereafter exhibit symptoms consistent with COVID-19, the defendant shall remain in quarantine or isolation as directed by Pretrial Services in a form directed by Pretrial Services, including self-isolation or self-quarantine.

### Conclusion

The information presently available to the Court, and as proffered herein, present sufficient evidence for this Court to determine that the defendant is a flight risk and that there are no conditions or combination of conditions that exist that would reasonably ensure her appearance as required. The COVID-19 outbreak does not alter that analysis and even if the Court found release

to be appropriate, the home plan set forth by the defendant is not a viable one. For the foregoing reasons, the Court should deny the defendant's motion with or without a hearing.

Respectfully submitted,

THOMAS T. CULLEN

United States Attorney

s/M. Coleman Adams
Assistant United States Attorney
VA State Bar No. 76450
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
coleman.adams@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Response in Opposition has been electronically filed by CM/ECF system, which will send notification of such filing to defendant's counsel, on this the 27th day of March 2020.

s/M. Coleman Adams
Assistant United States Attorney