**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 7:19-CR-00094** |
| | : | |
| **IOANA-CRISTINA PAVEL** | : | |

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

The United States, by counsel, respectfully submits this Response in Opposition to the Motion to Dismiss Indictment, ECF No. 78, filed by Defendant Ioana-Cristina Pavel. Pavel asserts that the government abandoned her prosecution when the Bureau of Immigration and Customs Enforcement elected to deport her following her admission to bail. She further alleges that her deportation has caused actual prejudice by violating her Fifth and Sixth Amendment rights. On these grounds she asks the Court to dismiss the indictment against her with prejudice. For the following reasons, the Court should deny her Motion.

## I.      Background

### A.  Pavel's Criminal Conduct

On May 5, 2019, victim M.D. called the Botetourt County Sheriff's Office from a Bank of Fincastle branch to report an unauthorized withdrawal from his wife's account. As M.D. waited, he observed a white female—with long black hair and a baseball cap—acting suspiciously, and standing at a drive thru ATM. He relayed this information to law enforcement and further advised that the female left the ATM, walked to a blue vehicle parked across the street, and quickly departed.

M.D. provided a description of the vehicle and direction of travel to law enforcement. A deputy then observed the vehicle and initiated a traffic stop. The driver, Szilard Farkas, and the

1

front seat passenger, Ioana-Cristina Pavel, initially denied being at the bank, using the ATM, or knowing anything about a woman with long black hair. Contrary to their claims, ATM security footage captured both Pavel and Farkas using multiple cards to make multiple cash withdrawals. Inside the vehicle, law enforcement recovered a black wig, $8,800 in U.S. currency, 46 gift cards that had been re-encoded with stolen debit account information, and materials related to the placement of skimming devices and pin hole cameras onto ATM machines. As a result of these events, Farkas and Pavel were arrested and held in state custody.

The United States Secret Service determined that Pavel and Farkas were part of a Romanian organization conducting ATM skimming activity in the Western District of Virginia and elsewhere. Members of this group installed skimming devices into the card readers on ATMs, and in conjunction with small hidden cameras they affixed to the ATMs, captured bank customer account numbers and PINs. They then took the account information, re-encoded it onto cards with magnetic stripes, and used those cards and PINs to make unauthorized cash withdrawals. Contrary to her assertion, Pavel was not "trafficked" to the United States by her co-defendants to commit these offenses. However, her role in the scheme was limited to making cash withdrawals.

**B.  Procedural History, Admission to Bail, and Removal**

On September 25, 2019, Pavel was brought into federal custody on a criminal complaint. ECF No. 1. At her initial appearance she did not contest her detention but reserved the right to request that conditions of release be set in the future. ECF No. 11. On October 17, 2019, she was indicted and charged with Bank Fraud, Access Device Fraud, and Aggravated Identity Theft. ECF No. 16. On October 23, 2019, the government provided counsel for Pavel with an initial discovery production. This production primarily related to the conduct for which Pavel had been charged.

A jury trial was scheduled to begin on December 24, 2019 but was continued by agreement

to January 30, 2020. ECF Nos. 27-30. On January 2, 2020, the government filed a superseding indictment, adding two additional defendants and a conspiracy count. ECF No. 32. The trial was then continued and re-scheduled for May 26-29, 2020. ECF Nos. 38-40. On January 27, 2020, the government provided a discovery production to all defendants. This production, which was more voluminous than the initial production to Pavel, contained that same information as well materials related to the group's conduct in Roanoke, Blacksburg, Henry County, Patrick County, Lynchburg, North Carolina and West Virginia. It also included information from the banks that had been impacted as a result, including surveillance video and spreadsheets regarding losses.

On January 31, 2020, the Secretary of Health and Human Services declared a public health emergency in response to the global outbreaks of COVID-19. On March 13, 2020, the President of the United States declared a national emergency as the rates of infection continued to rise across the country. In response to the pandemic, this Court asked the government to consider the release of non-violent offenders who were pending trial and sentencing. On March 23, 2020, counsel for Pavel inquired as to the government's position regarding bail. The government responded that it opposed her release and further advised that there was an immigration detainer in place.

On March 26, 2020, Pavel filed a Motion for Release on Bond, asserting that the risk of illness posed by the novel coronavirus, and the non-violent nature of her offenses, merited her release. ECF No. 53. She proposed living at the Roanoke Rescue Mission pending the trial of this matter. *Id.* In opposing the motion, ECF No. 54, the government advised the Court of the immigration detainer but also stated that it was uncertain as to what would occur if Pavel were released. *Id.* at 5. On March 31, 2020, Judge Ballou entered an oral order granting Pavel's Motion. ECF No. 55.

Just prior to this ruling, the government learned that Immigration, Customs and Enforcement

(ICE) would be taking custody of Ms. Pavel if she were released. This decision was, in part, based upon the defendant's connection to a criminal organization in Romania. The Probation Office also learned of this information after the ruling and relayed it to the Court. This development prompted Judge Ballou to ask counsel for Pavel whether she wanted him to enter his bond order or have Pavel stay in the marshal's custody at the Roanoke City Jail. Understanding that her client would be taken into ICE custody, Pavel's counsel requested that the Court enter its order.

ICE then transported Pavel to the Caroline Detention Facility in Bowling Green, Virginia. On April 3, 2020, ICE transferred her to the Irwin County Detention Center in Ocilla, Georgia. Pursuant to Second Amended Standing Order 2020-5, on April 17, 2020, the Court continued the trial of this case from May 26, 2020, to February 8, 2021. ECF No. 58. At that time, Pavel remained in ICE custody. The government provided another supplemental discovery production on April 30, 2020. The materials provided therein primarily related to acts committed by Pavel's co-defendants and co-conspirators.

On May 19, 2019, an attorney with ICE contacted the United States Attorney's Office (USAO) and advised that Pavel had appeared for her master calendar hearing—similar to an initial appearance in a criminal case—and accepted a final order of removal.[1] The attorney further advised that Pavel was going to be removed from the United States on May 26, 2020. Pavel in fact departed the United States on that date and is presently in Romania. In early June 2020, the government notified counsel for Pavel of the removal.

**C. Post-Removal**

Prior to Pavel's departure, the government notified Romanian authorities of her impending

---

[1] A recording of this hearing, from April 28, 2020, will be separately provided to the court and counsel for the defendant.

4

return. Pavel, who at the time of her arrest was a suspect in a related Romanian investigation, has since been charged with money laundering by the Romanian authorities. Her case there is still pending and the government continues to monitor her status.

As part of its continued interest in prosecuting this matter, the government obtained a phone number for Pavel. On June 24, 2020, the government provided this number to her attorney. The government is not aware as to whether they have been able to communicate since that date. Pavel's trial is presently scheduled to begin on February 8, 2021. However, Second Amended Standing Order 2020-10 and 2020-14 necessitate a continuance. As such, counsel for the government, and co-defendant Marius Catalui, have preliminary discussed re-scheduling the trial to begin the week of May 10, 2021.

Pavel's presence in Romania does not preclude her return to the United States for trial. *See* Extradition Treaty with Romania and Protocol to the Treaty on Mutual Legal Assistance in Criminal Matters with Romania, U.S.-Rom., Sept. 10, 2007, S. Treaty Doc. No. 110-11, *available at* https://www.congress.gov/treaty-document/110th-congress/11?s=1&r=39 (last accessed December 14, 2020). The government intends to attempt to secure her return for trial, or a later prosecution if necessary, and has already discussed how to begin this process with the Office of International Affairs.

## II. Argument

A federal court has supervisory powers to formulate procedural rules not specifically required by the Constitution or Congress. *United States v. Hasting*, 461 U.S. 499, 505 (1983). "The purposes underlying use of [these powers] are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct."

*Id.* (citations omitted). "The sanction of dismissal with prejudice, however, is a harsh remedy for enforcement of those powers, and, indeed its use becomes a significant event." *United States v. Goodson*, 204 F.3d 508, 514 (4th Cir. 2000). A court cannot dismiss an indictment with prejudice, "unless the violation caused prejudice to the defendant or posed a substantial threat thereof." *Id.*

### A. The Government did not violate Pavel's rights under the Bail Reform Act or the Court's Order granting release.

The defendant implies, if not states, that every time ICE takes a defendant admitted to bail into their custody, the government violates the Bail Reform Act (BRA), 18 U.S.C. § 3142. She also asserts that when the government is confronted with choosing between taking an alien into custody for removal, or pursuing criminal charges, it must choose one option and not the other. ECF No. 78, at 3-4 (citing *United States v. Trujillo-Alvarez*, 900 F. Supp. 2d 1167, 1170 (D. Or. 2012)). The government disagrees, as have four other Circuit Court of Appeals who have rejected the reasoning set forth in *Trujillo-Alvarez*. *See United States v. Pacheco-Poo*, 952 F.3d 950 (8th Cir. 2020); *United States v. Vasquez-Benitez*, 919 F.3d 546 (D.C. Cir. 2019); *United States v. Lett*, 944 F.3d 467 (2d Cir. 2019); *United States v. Veloz-Alonso*, 910 F.3d 266 (6th Cir. 2018).[2]

A court's order releasing a defendant under the BRA–which governs a federal court's authority to detain a defendant for criminal judicial proceedings–does not bar ICE from detaining that person under the Immigration and Naturalization Act ("INA"), which separately authorizes ICE to civilly detain an alien for administrative proceedings. First, the plain language and statutory frameworks of both statutes demonstrate that they operate concurrently, and should not be read to place limitations on each other. Second, the relevant canons of statutory construction

---

[2] This Court may have also rejected this reasoning in previously denying a Motion to Dismiss on this particular ground. *See United States v. John Douglas Dor*, Case No. 4:19-CR-6, ECF No. 56 (W.D. Va. Nov. 22, 2019) (order denying ECF No. 44).

as applied to the INA and BRA support an interpretation that does not require the government to elect between criminal prosecution and administrative deportation proceedings. Finally, the BRA does not confer special immunity to defendants who are given pretrial release.

1.   <u>The plain language of the BRA and the INA shows that they operate concurrently</u>

The plain language of each statutory scheme neither limits the operation of the other, nor allows the court to require that the government choose which proceeding to pursue.

First, under the INA, ICE is authorized, and sometimes required, to detain aliens who are subject to removal from the United States. *See* 8 U.S.C. §§ 1226(a)(1) (discretionary detention for an alien pending decision on removal); 1226(c) (mandatory detention pending a removal decision for aliens with certain criminal convictions); 1231(a)(2) (mandatory detention for aliens with final orders of removal). Notably, the INA makes no reference to any subordinate (or any other relationship) to the BRA within its text, indicating that it operates both concurrently with, and independently of, the BRA.

Second, under the BRA, only subsection (d) of section 3142 mentions the INA.  But, Section 3142(d) merely requires that the judicial officer: (1) detain individuals who are not citizens or lawfully admitted for residence for not more than ten days; and (2) notify "the appropriate official of the Immigration and Naturalization Service." 18 U.S.C. § 3142. It does not forfeit the government's ability or obligation to detain or remove an alien who also happens to be a criminal defendant until the criminal proceedings are complete. The BRA is silent about an Article III judge's authority to order an alien's release from civil detention in administrative proceedings precisely because the BRA confers no such authority. The BRA's silence does not override the detailed INA provisions specifically providing for the release or detention of aliens in separate administrative proceedings. *See Epic Sys. Corp v. Lewis*, 138 S. Ct. 1612, 1624 (2018).

Further, the BRA makes clear that it applies exclusively to bail determinations in "judicial proceedings" and authorizes the release of only those individuals over whom a judicial officer has arrest authority. 18 U.S.C. § 3141(a). The BRA does not govern bail determinations in all federal proceedings and, because Article III courts are not "authorized to order the arrest of a person" charged with violations of civil immigration law, 8 U.S.C. § 1103(a)(1)-(3) (giving that power to the Secretary of Homeland Security), the BRA by its terms precludes a court from ordering that an alien civilly detained in administrative proceedings "be released or detained under the BRA." 18 U.S.C. § 3141(a).

In light of the plain language of the statutes at issue, the Executive Branch does not violate its duties in the criminal arena by exercising its valid powers in the immigration arena. Nor would it violate any of the defendants' rights by taking them into immigration custody under the ICE detainer. Indeed, the Supreme Court has opined that "[d]etention during [alien] removal proceedings is a constitutionally permissible part of that process." *Demore v. Kim*, 538 U.S. 510, 531 (2003).

Confronted with the same question now before this Court, six Circuit Courts of Appeal have concluded that there is no conflict between the BRA and INA. *See United States v. Barrera-Landa*, 964 F.3d 912, 922-24 (10th Cir. 2020) (affirming district court's denial of the defendant's request to enjoin ICE from detaining or deporting him if released under the BRA as the BRA and the INA are capable of co-existing); *United States v. Pacheco-Poo*, 952 F.3d 950, 952 (8th Cir. 2020) (rejecting defendant's argument that a BRA release order precludes INA removal, explaining that "[t]he BRA and INA can coexist" because "the BRA does not have any clearly expressed intention to subordinate the INA"); *United States v. Vasquez-Benitez*, 919 F.3d 546, 553-54 (D.C. Cir. 2019) (explaining that "Congress has never indicated that the BRA is intended

8

to displace the INA" and vacating the district court's order prohibiting the USMS from delivering the defendant to ICE); *United States v. Lett*, 944 F.3d 467, 471 (2d Cir. 2019) ("The BRA and the INA authorize the government to pursue both criminal prosecution and removal simultaneously, and there is no conflict between the detention-and-release provisions of the two statutes."); *United States v. Soriano Nunez*, 928 F.3d 240, 247 (3d Cir. 2019) (finding "no textual conflict between the BRA and the INA" and concluding that the district court "correctly declined to hold that Soriano Nunez's BRA release order mandated her release from ICE detention"); *United States v. Veloz-Alonso*, 910 F.3d 266, 270 (6th Cir. 2018) (finding no conflict between the BRA and the INA and reversing order enjoining ICE from detaining defendant under the INA because "ICE may fulfill its statutory duties under the INA to detain an illegal alien pending trial or sentencing regardless of a BRA release determination.").

The government asks this Court to similarly rule and reject the view that the Executive Branch must choose between taking an alien into custody for removal or pursuing criminal charges.

2. <u>Canons of statutory construction preclude the judiciary from requiring the government elect whether it wants to pursue the criminal process or deportation proceedings.</u>

The Supreme Court has instructed that "when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intent to the contrary, to regard each as effective . . . . ." *Morton v. Mancari*, 417 U.S. 535, 551 (1974); *cf. Rake v. Wade*, 508 U.S. 464, 471 (1993) (statutes must not, if at all possible, be interpreted "so as to suspend or supersede another provision").

Applying these canons, the Sixth Circuit held that there is "no conflict between the BRA and [the] INA." *Veloz-Alonso*, 910 F.3d at 270. On one hand, "the BRA presumes detention but allows for the permissive release of a criminal defendant." *Id.* On the other hand, "the INA mandates the detention of certain illegal aliens." *Id.* As the Sixth Circuit explained: "Reading the BRA's

9

permissive use of release to supersede the INA's mandatory detention does not follow logically nor would doing so be congruent with our canons of statutory interpretation." *Id.* Of note, the Sixth Circuit expressly rejected the *Trujillo-Alvarez* line of cases in applying its holding to pretrial detention, holding that "ICE may fulfill its statutory duties under the INA to detain an illegal alien pending trial or sentencing regardless of a BRA release determination." *Id.*

3. <u>The BRA does not create a special status for defendants who are released from criminal detention, such that an independent government agency cannot detain them under another statute, for a different purpose.</u>

"[N]othing in the BRA prevents other government agencies or state or local law enforcement from acting pursuant to their lawful duties." *Id.* at 269. Holding otherwise would create a special status for criminal defendants who are in the country illegally—making some illegal reentry defendants effectively immune from prosecution or detention. In addition to the concerning policy implications of such a finding by the Court, the statutory framework does not support this result, as discussed above.

4. <u>Any alleged violation of the BRA is now moot.</u>

Finally, as an alternative to the arguments set forth above, the government asserts that because the defendant has been removed, and is no longer in the government's custody, the lawfulness of her detention is moot. Unless, and until, she is returned for prosecution, the Court should decline to rule on this aspect of the defendant's motion.

**B. The United States Has Not Abandoned the Prosecution of the Defendant**

The defendant argues that the government chose to abandon her criminal prosecution when it removed her from the country. As a result, the defendant asks this Court to dismiss her indictment, citing to *United States v. Resendiz-Guevara*, 145 F. Supp. 3d 1128, 1133 (M.D. Fla. 2015) in support. ECF No. 78, at 4-5. In *Resendiz-Guevara*, the defendant, who had been charged with

illegal re-entry, was ordered to be released on bond but was instead removed from the United States. *Id.* at 1131-1132. The district court ruled that in removing the defendant, the government abandoned its prosecution. *Id.* at 1133-1137. The district court also found that the defendant's Fifth and Sixth Amendment rights were violated, as he could not consult with counsel or otherwise prepare a defense. *See Id.* at 1137-1139. As a result, the district court then dismissed the indictment against the defendant, *without prejudice*. *Id.* at 1140 (emphasis added).

*Resendiz-Guevara* is not analogous to the instant case. First, the matters are different in character. There, the defendant was charged with an immigration offense, presumably coming to the immigration authorities' attention before being referred for prosecution. Here, the defendant was arrested by local law enforcement, whose prosecution was then adopted by the United States Attorney's Office (USAO). Although ICE clearly knew of her arrest, their involvement was passive until she was ordered to be released on bond on March 31, 2020. While this distinction does not divest ICE and the USAO of any responsibility to communicate, it is still a factor this Court should consider.

Second, *Resendiz-Guevara* was removed nearly as soon as his prosecution commenced. Here, Pavel was arrested in May 2019, charged federally in October 2019, and detained locally through March 2020. During her five months in federal custody, the government continued to gather evidence related to the group's conduct, supplied two discovery productions, and engaged in preliminary discussions about her case. Even after her removal, the government notified Romanian authorities of her return and continues to monitor her status in that country. The USAO has also inquired into actions that it can take in order to secure her return prior to trial or for a future prosecution. In sum, the USAO has not abandoned its prosecution.

Further, the federal regulations cited to by the defendant, 8 C.F.R. §§ 215.2(a) and 215.3, do

not relate to removal. They apply to voluntary departures and do not affect the government's authority to deport such aliens pursuant to final orders of removal. *See United States v. Barrera-Landa*, 964 F.3d 912, 923 (10th Cir. 2020) (citations omitted) and *United States v. Lett*, 944 F.3d 467, 473 (2d Cir. 2019) (distinguishing the regulations governing removal and departure) (citations omitted). Furthermore, there is no statute that expressly precludes the removal of a criminal defendant pending trial. *See United States v. Villatoro-Ventura*, 330 F. Supp. 3d 1118, 1141, 2018 U.S. Dist. LEXIS 156694, *45 (N.D. Iowa Sept. 12, 2018) (stating that Congress could, and maybe should, provide a legislative solution to the practice of seeking removal of criminal defendants pending trial).

Pavel's removal was not the product of a coordinated decision to abandon prosecution. Rather it was the result of ICE, a separate agency from the USAO, operating pursuant to its legal requirements.[3] The facts of this case are also distinguishable from those presented in *Resendiz-Guevara*. Therefore, the Court should not consider dismissing the indictment on this ground alone.

## C. The Defendant's Fifth Amendment Right to Due Process and Sixth Amendment Right to Counsel Have Not Been Violated.

In order to find that Pavel has been denied her Fifth Amendment right to due process, this court must rule that her removal necessarily prevents a fair trial. *See Resendiz-Guevara*, 145 F. Supp. 3d 1128, 1137 (M.D. Fla. 2015) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982)). Pavel will not be tried in her absence and her trial, although presently scheduled

---

[3] The government acknowledges that there is a process by which the USAO can request a writ to have a criminal defendant remain in ICE custody during the pendency of a criminal prosecution. However, the availability of this process does not confer upon the USAO the power to stop every removal that may be prejudicial to its interests. A writ also does not alleviate the conflict between a Court's bail determination and an ICE detainer, such that a replay of events could potentially occur upon that individual's return to this district.

for February, is likely to be continued until May 2021. Thus, it would be premature to find that her removal has infringed upon this right.

With respect to her Sixth Amendment claim, Pavel and her counsel had five months to communicate, review the majority of government's evidence against her, and discuss whether to proceed to trial or attempt to resolve by way of an agreement. Additionally, upon her return to Romania, the government obtained Pavel's phone number and provided it to her counsel. If counsel has not been able to communicate with Pavel utilizing this number, the government is more than willing to assist in finding another method to facilitate their communication. The COVID-19 pandemic has caused the world to increasingly rely on alternative means of communication, such as Skype, Zoom, Facetime, and the like. The bare assertion that Pavel's removal prevents her from communicating with counsel is insufficient to show that a Sixth Amendment violation resulting in prejudice has occurred.

### III.    Conclusion

At the time of the superseding indictment, no one could have foreseen the impact that the pandemic would have on our country, much less the judicial system. The circumstances that enabled Pavel's release to bond and continued her case from May 26, 2020, were not caused by the government. Additionally, Pavel's return to Romania was desired. She requested to be released knowing that she would be taken into ICE custody and ultimately accepted an order of removal. The government cannot, and does not, claim her exit was entirely of her own volition. Nevertheless, it should be a factor this court takes into consideration.

For the above-stated reasons, the government respectfully requests that the Court dismiss the defendant's motion. Should the Court find that her constitutional rights have been violated, in the absence of actual prejudice suffered by the defendant, the government would alternatively request

dismissal of the indictment without prejudice as a lesser remedial action that would adequately remedy such a violation.

Respectfully submitted,

DANIEL P. BUBAR
United States Attorney


*/s/ M. Coleman Adams*
Assistant United States Attorney
VA State Bar No. 76450
U.S. Attorney's Office
310 First St., S.W., Ste. 906
Roanoke, Virginia 24011
540-857-2250 (phone)
540-857-2614 (fax)
coleman.adams@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, I caused the foregoing Response in Opposition to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/M. Coleman Adams*
Assistant United States Attorney
